■ SATIRA C. LEWIS et al., Appellants, v ANDREA CAPALBO, M.D., Respondent, et al., Defendant. [720 NYS2d 455] —Order, Supreme Court, New York County (Karla Moskowitz, J.), entered on or about August 18, 1999, which granted the motion for renewal by defendant Andrea Capalbo, M.D., and upon renewal, granted summary judgment dismissing the complaint against her, unanimously modified, on the law, to the extent of denying summary judgment and reinstating the complaint, and otherwise affirmed, without costs.

Plaintiff, Paulette S. Lewis, on behalf of her infant daughter Satira, and individually, brought this action alleging medical malpractice committed by defendant hospital and defendant Andrea Capalbo, M.D. during the birth of Satira. Dr. Capalbo was one of five obstetricians at the Manhattan Medical Group also known as the Yorkville HIP Center (HIP Center), which Ms. Lewis visited for prenatal care numerous times a few months near the end of her third trimester.

On the day of delivery, August 4, 1986, at 4:30 P.M., Dr. Capalbo, the HIP Center attending physician on call, examined Ms. Lewis, but left the hospital afterwards and had no further contact with her. Although Ms. Lewis was placed on a fetal monitor, according to her testimony she began the labor process on her own until the baby's head had partially traveled outside the birth canal and she was holding it on the palm of one of her hands. At this point, her husband ran out and called in an unidentified doctor standing in the hallway who, along with several nurses, completed the delivery.

Satira was delivered at 4:55 A.M. on August 5, 1986, weighing five pounds six ounces with an APGAR score of eight at one minute and an APGAR score of nine at five minutes (scores range from one to ten and a number above seven is normal). However, in the subcategory of respiratory effort, Satira received an APGAR score of one at one minute and two (changed from one) at five minutes, and in the category of skin color, an APGAR score of one both after one minute and after five minutes (scores for subcategories range from zero to two,

and a score of one signifies an irregularity, while a score of two is normal).

Despite the APGAR score of two after five minutes for respiratory effort, it is undisputed that a short time after her birth Satira was admitted to the neonatal intensive care unit with serious respiratory difficulties where she remained for 12 days until her discharge, the first four of which she was in a ventilator. Satira's newborn medical records are incomplete. She currently suffers from seizure disorders and cognitive and developmental problems that will require lifelong medical care.

Dr. Capalbo moved for summary judgment dismissing the complaint against her, arguing that she had not delivered Satira and that Ms. Lewis's prenatal care was within acceptable standards of medical care. The IAS Court initially denied the motion because the medical expert's name and signature were redacted. On renewal and upon submission of an unredacted medical affidavit, the motion was granted on the grounds that Dr. Capalbo did not owe a duty to monitor Ms. Lewis personally during Satira's birth and that Satira's injuries were not the result of an independent act or omission by Dr. Capalbo. For the reasons stated below, we disagree.

As a preliminary matter, the IAS Court exercised its discretion appropriately in permitting Dr. Capalbo to renew her motion for summary judgment upon an unredacted medical expert affidavit in the interest of justice (*see generally*, *Petito v Verrazano Contr. Co.*, 246 AD2d 636).

It is well established that a doctor who undertakes to examine and treat a patient (thus creating a doctor-patient relationship) and then abandons the patient may be held liable for medical malpractice (*O'Neill v Montefiore Hosp.*, 11 AD2d 132; *Heraud v Weissman*, 276 AD2d 376). In this case, there are triable issues of fact as to whether Dr. Capalbo was Ms. Lewis's doctor and whether she departed from good medical practice by allegedly abandoning Ms. Lewis after admitting her to the hospital during the early stages of labor.

Dr. Capalbo argues that there was no doctor-patient relationship between her and Ms. Lewis because she only saw Ms. Lewis once at the HIP Center and neither Ms. Lewis nor Ms. Lewis's husband attempted to contact her prior to Satira's delivery. However, Ms. Lewis testified in her deposition that she was told that Dr. Capalbo would be her attending physician and the one who would deliver her baby (*compare*, *Kleinert v Begum*, 144 AD2d 645 [no prior relationship between doctor and patient other than examination two hours prior to the baby's delivery]). Dr. Capalbo, in fact, was the attending physi-

cian who examined Ms. Lewis when she was admitted to Beth Israel in the early stages of labor. Although Dr. Capalbo was not in the hospital at Satira's delivery, she signed Ms. Lewis's labor and delivery chart as well as her discharge forms certifying that the matter of Ms. Lewis's treatment was "cleared for billing." Thus, a jury could reasonably conclude that Dr. Capalbo was Ms. Lewis's doctor.

Dr. Capalbo does not dispute that she left the hospital after examining Ms. Lewis and had no further contact with her. Instead, she argues that she did not have a duty to continually monitor Ms. Lewis and thus did not abandon her because the admission and medical authorization form Ms. Lewis signed stated that the delivery and related care could be provided by "associates or assistants" of Beth Israel Medical Center of Dr. Capalbo's choice. The record, however, contains nothing to indicate that Dr. Capalbo affirmatively transferred the care of Ms. Lewis to the two doctors whose names, in addition to Dr. Capalbo's, appear in the Labor and Delivery Summary form (even though neither of them participated in Satira's delivery according to the testimony of Ms. Lewis). Dr. Capalbo did not inform Ms. Lewis that the two doctors would be monitoring her after the initial examination took place. In addition, there is nothing in the record to indicate that the two doctors were associates or assistants of Dr. Capalbo.

As to proximate cause, the affidavit of plaintiffs' pediatric neurologist expert, Dr. Daniel G. Adler, stated that it was his impression that Satira suffered from, among other things, "newborn respiratory distress," "seizure disorder," and "language-based learning disability," which resulted from "a significantly abnormal newborn interval." Dr. Adler based his opinion, among other things, on a review of Satira's labor and delivery records, her billing records, and a personal examination. Dr. Adler's affirmation was, therefore, specific and based on the record (see, Romano v Stanley, 90 NY2d 444).

Plaintiffs' obstetrics expert reviewed Satira's labor and delivery records as well as Dr. Adler's report in concluding that Satira's condition was probably due to hypoxia (deficient oxygenation of the blood). According to the expert, had Dr. Capalbo monitored Ms. Lewis's progress, hypoxia could have been avoided or significantly minimized.

The experts' affidavits in conjunction with the lack of fetal monitoring from 3:00 A.M. to 5:00 A.M., along with Ms. Lewis's undisputed testimony that the baby was traveling down the birth canal, that the baby stopped and that she was holding the baby's head in her hand before any physician attended to

the delivery, raise triable issues of fact regarding Dr. Capalbo's negligence in failing to attend the delivery of Satira and whether her absence caused Satira's injuries. Concur—Rosenberger, J. P., Ellerin, Lerner and Friedman, JJ.