[879 NYS2d 440]

LIAM CREGAN, Individually and as Coadministrator of the Estate of KAY CREGAN, Deceased, et al., Appellants, v MICHAEL E. SACHS, M.D., et al., Defendants, and MADHAVARAO SUBBARO, M.D., Respondent.

First Department, May 28, 2009

## APPEARANCES OF COUNSEL

*Kramer, Dillof, Livingston & Moore,* New York City (*Matthew Gaier* of counsel), for appellants.

*Costello, Shea & Gaffney, LLP,* New York City (*Sylvia E. Lee* and *Frederick N. Gaffney* of counsel), for respondent.

## OPINION OF THE COURT

NARDELLI, J.P.

The threshold issue is the extent of an anesthesiologist's postoperative duties to his patient after a procedure which took place in a doctor's office, but required the patient to remain in the office overnight.

Plaintiff's decedent, Kay Cregan, died on March 17, 2005, at the age of 42, from complications resulting from plastic surgery performed by defendant Michael E. Sachs in his office in New York. Defendant Dr. Madhavarao Subbaro provided anesthesiologic services for the surgery.

The decedent, who lived in Ireland, had contacted Dr. Sachs after hearing publicity about him, and they met in Ireland to discuss the procedures she was interested in having. They agreed that Dr. Sachs would perform five procedures: facial

cervical reconstruction (face-lift); bilateral upper/lower eyelid blepharoplasty; nasal septal reconstruction; upper/lower lip augmentation; and chin augmentation. Ms. Cregan came to the United States for the surgery on March 14, 2005, the surgery was performed the same day, and she died three days later in St. Luke's Hospital.

At one time Dr. Sachs had been chairman of the Department of Facial Plastics at New York Eye and Ear Infirmary, but his relationship with New York Eye and Ear terminated in 2001, and he has not had operating privileges with any hospital since then. In 2004 the New York State Department of Health charged that he had committed misconduct through negligent practice of medicine on repeated occasions between May 1985 and December 1993. After he agreed to the charge his medical license was placed on probation for a period of three years. Dr. Sachs did not tell Ms. Cregan that his license was on probation or that he had been sued about 30 times by patients upon whom he performed facial surgery.

Codefendant Dr. Subbaro is a board-certified anesthesiologist who, since about 1997, has provided anesthesia services for plastic surgeons who perform surgery in private offices. Starting in about 2003, Dr. Subbaro worked for Dr. Sachs about three or four days per month, for which he was paid $2,500 per day, regardless of how many patients he saw. On some days he saw as many as five or six patients, and was "[n]ot too sure" if it could be as many as 10.

On the date of Ms. Cregan's surgery, Dr. Subbaro worked on seven or eight patients, including a nasal reconstruction and several smaller procedures. He started the anesthesia for Ms. Cregan at 6:00 P.M., and the operation lasted about three hours, from 6:15 P.M. until 9:10 P.M. He stood to the right side of the patient throughout the operation, administering agents. During the operation bleeding resulted from the reconstruction of the nasal septum, as well as the other procedures.

Dr. Sachs left the office a few minutes after the surgery ended. Dr. Subbaro testified that he was "in and out" of the recovery room from 9:15 until 10:30 or 11:00, when he left. The recovery room nurse, defendant Susan Alonzo-Francisco, believed that Dr. Subbaro left shortly after the operation ended, sometime after Dr. Sachs, at around 9:30 P.M.

After the operation, Ms. Cregan was bandaged while in a drowsy state, and was moved to the adjacent recovery room. Dr. Sachs testified that moving the patient is generally the "prov-

ince of the anesthesiologist and the nurses." Ms. Cregan and another patient were watched in the recovery room that night by nurse Alonzo-Francisco, who was retained by Dr. Sachs for evening work on occasion, and was paid by him on a per diem basis.

Dr. Subbaro testified that, before he left, nurse Alonzo-Francisco told him the patient was doing well and was comfortable. He himself spoke to the patient before he left the office, when she was groggy but able to answer and she said she was fine. Dr. Subbaro's only postoperative note indicated that the patient was "recovering, stable, sleepy" and that her oxygen saturation was 97%, heart rate 70, and blood pressure 100/61. He said that, before leaving, he "made sure" the nurse had his telephone numbers and told her to call him if she needed him. The nurse testified that she did not recall him giving her any instructions regarding patient care before he left. She already had his telephone number on her cell phone.

Dr. Subbaro stated that he had worked with nurse Alonzo-Francisco before and knew from talking to her that she was a "very knowledgeable person" and "not dumb." He knew she was "certified by the ACLS," i.e., Advanced Cardiovascular Life Support, and "knew exactly what to do" if complications occurred in the recovery room. He indicated that nurse Alonzo-Francisco was "certified to know the technique" for passing an endotracheal tube, and that she had told him she "took the course and she knows how to intubate." It was his understanding that ACLS training includes intubation. He stated that a laryngoscope and endotracheal tube were kept in the operating room in Dr. Sachs's office and the nurses were aware of their location.

Nurse Alonzo-Francisco testified that she received ACLS certification training every two years, but that she was never taught how to insert an endotracheal tube. Nor was she ever taught by Dr. Sachs, Dr. Subbaro or any other doctor how to intubate a patient. In the course of her practice, she had never intubated a patient, and nobody ever showed her where an endotracheal tube was kept in Dr. Sachs's office. She pointedly testified, "We are not allowed to intubate patient[s]."

Referring to the medical notes she kept, Alonzo-Francisco testified that at 6:30 A.M. on March 15, the morning following the procedure, she was assisting Ms. Cregan in walking to the bathroom when the patient said she was dizzy. Ms. Cregan then said she was fainting, so the nurse helped her lie on the floor,

and then reconnected her to the monitor. The patient's blood pressure was 84/56, which was good, and her heart rate was 72, which was normal, but her blood oxygen saturation was 70%. An oxygen saturation level below 90% is not normal, and a level below 88% is "bad." A level of 70% is indicative of hypoxemia, which shows that the blood has a low level of oxygen, and indicates a danger of respiratory distress.

The nurse started mouth-to-mouth resuscitation. She also took an "Ambu bag" and mask from a cabinet, got an oxygen canister, attached the bag to the canister, put the mask on the patient's mouth and began squeezing the bag. When she squeezed the bag, she felt resistance, which meant there was an obstruction in the airway. She squeezed a second time, and although the oxygen seemed to enter the passageway, she realized she needed assistance.

Using her cell phone, nurse Alonzo-Francisco called the operating room nurse, Liza, the building doorman, Dr. Sachs and Dr. Subbaro, though she did not recall the sequence or times of those calls. The doorman came into the office, which is on the lobby level, and called 911, while she continued CPR. She told Dr. Sachs the patient was not breathing and that she would call 911 right away. She told Dr. Subbaro that the patient had stopped breathing, and asked him to come down. He told her to call 911. She testified that he did not tell her to intubate the patient.

Dr. Subbaro testified that the nurse called him at his home between 6:30 A.M. and 7:00 A.M., and told him she was calling to let him know the patient had collapsed and that she had called Emergency Medical Service (EMS). After EMS personnel arrived, she told him that they were taking care of the patient, and would transfer her to the hospital.

The ambulance call report indicates that the ambulance arrived at 6:40 A.M., at which time Ms. Cregan was in cardiac arrest. EMS personnel intubated her, and performed life support treatment. She was taken to the emergency room at St. Luke's Hospital, where she arrived at 7:09 A.M. The hospital chart indicated that the suspected cause of cardiac arrest was a blood clot obstructing the airway. The patient was admitted to the intensive care unit with a poor prognosis. She had no brain stem function the next day, and was declared dead the following day, March 17th.

This action was commenced against Dr. Sachs, his professional corporation, Dr. Subbaro, and the nurse. Plaintiffs' bill of

particulars alleged that Dr. Subbaro's negligence included failing to ensure proper postoperative care, failing to have a qualified individual treat and monitor the decedent postoperatively, abandoning the patient postoperatively, and failing to timely intubate the patient.

After discovery, Dr. Subbaro moved for summary judgment. In support of his motion he offered the affirmation of his expert in anesthesiology, Dr. Martin Griffel, who opined that the anesthetic care rendered by Dr. Subbaro was appropriate, and that the patient was an "appropriate candidate for the procedures intended" based on her age and vital signs. He noted that Ms. Cregan had "tolerated the anesthesia and operative procedures very well and was taken into the recovery room in stable condition." In a conclusory fashion, he observed that Dr. Subbaro appropriately left the patient with a "qualified" nurse. Dr. Griffel did not recite what the nurse's qualifications were, or how he knew that she was qualified.

Dr. Griffel concluded that Dr. Subbaro appropriately monitored the patient postoperatively in accordance with good and accepted medical practice, and that this standard of care "would not require [him] or any other anesthesiologist to monitor a patient more than what was done." Further, the events that transpired the next morning at around 6:30 A.M. "had nothing to do with the surgical anesthesia or Dr. Subbaro's care of the decedent," and the patient was "fully recovered from the anesthesia" prior to that time. Dr. Subbaro "did not deviate or depart from any standards of care in his treatment of the patient."

In opposition, plaintiffs submitted an expert affidavit of a board certified anesthesiologist whose identity was redacted. Plaintiffs' expert concluded that Dr. Subbaro "departed from good and accepted medical practice in the care he rendered to Kay Cregan which directly resulted in her death." Plaintiffs' expert observed that the nurse's postoperative notes showed Ms. Cregan had significantly low blood pressure and normal oxygen saturation levels from 9:15 P.M. to 6:30 A.M. He also concluded that a drop from 96% oxygen saturation at 6:30 A.M. to 70%, after the nurse helped the patient lie down on the floor, was "impossible" because "[h]umans do not desaturate that rapidly to the critically hypoxemic level of 70% saturation while they are spontaneously breathing 21% atmosphere air." Therefore, he stated, the nurse's documentation was inaccurate in depicting the patient's actual deterioration. The expert opined

that Ms. Cregan's eventual cardiac arrest was due to departure from good medical practice by nurse Alonzo-Francisco in her monitoring of the patient.

He further concluded that the decedent received no oxygen during a 10-minute period between 6:30 A.M. and 6:40 A.M. due to the nurse's failure to follow appropriate airway management steps so oxygen could be delivered, and that the respiratory arrest was caused by postoperative bleeding resulting in airway obstruction. He also concluded that the nurse was not qualified to properly assess the situation and react to the emergency, nor to care for the patient, and that Dr. Subbaro deviated from the standard of care owed to his patient by leaving her in an office suite without qualified staff to monitor her condition. The expert specifically noted that since Ms. Cregan was not in a hospital setting it was even more crucial that she be attended by a qualified individual.

The expert opined, to a reasonable degree of medical certainty, that if Ms. Cregan had been oxygenated before EMS arrived, her respiratory arrest would not have evolved to cardiac arrest, and if she had been timely intubated and oxygen timely administered, full-blown cardiac arrest and death would have been avoided.

The motion court granted Dr. Subbaro's motion. The court found that defendant made a prima facie showing of entitlement to summary judgment based on his expert's affirmation, and had shown that he "provided a proper informed consent regarding the anesthesia," "appropriately left the patient with a nurse in the recovery room," and was "not required to stay with the patient and to monitor her" (2008 NY Slip Op 30474[U], *2). Further, the events that transpired at 6:30 A.M. the next morning "had nothing to do with the surgical anesthesia or with Dr. Subbarao's care of the patient" (id.). The court also concluded that Dr. Subbaro did not have any "duty . . . to ensure that the recovery room nurse was qualified to manage an airway obstruction and to intubate the patient," since the nurse was an agent of Dr. Sachs, and not of Dr. Subbaro (id. at *3).

> "In a medical malpractice action, a plaintiff, in opposition to a defendant physician's summary judgment motion, must submit evidentiary facts or materials to rebut the prima facie showing by the defendant physician that he was not negligent in

treating plaintiff so as to demonstrate the existence of a triable issue of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]).

"The failure to make . . . a prima facie showing requires the denial of the motion[, however], and renders the sufficiency of plaintiff's opposition immaterial" (*Wasserman v Carella*, 307 AD2d 225, 226 [2003]).

██ Our review of defendant's expert's affirmation reveals that it was not sufficient to meet defendant's burden of establishing a prima facie case. It totally ignored the nurse's admission that she did not know how to intubate, when the expert stated that Dr. Subbaro left the patient with a nurse qualified to care for her. Absent a showing that the risk of a blood clot in the airway was not a potential consequence of the procedures the patient underwent, and that the need for intubation would be nonexistent, the expert's failure to address the nurse's qualifications, or the fact that the surgery was performed in a doctor's office, as opposed to a hospital, effectively precludes a finding that defendant met his prima facie burden.

"[T]he submission of the affidavit of a medical expert which fails to address the essential factual allegations set forth in the complaint [is] insufficient to establish that defendant is entitled to summary judgment" (*Wasserman*, 307 AD2d at 226; *see also Mirabella v Mount Sinai Hosp.*, 43 AD3d 751, 752 [2007]). Plaintiffs' bill of particulars put the anesthesiologist on notice that he was being charged with failing to ensure that the decedent received appropriate postoperative care, and failing to supervise properly the nurse administering the postoperative care. The conclusory averments that the nurse was qualified to care for the patient, and that there was no obligation that he stay with the patient, even though she was not in a hospital, were not sufficient.

Even if defendant had met his prima facie burden, the strength of the affidavit of plaintiffs' expert was sufficient to establish the existence of factual issues. He opined, with compelling logic, that a doctor is required to ensure that a patient who has undergone "major airway and facial surgery" be "left in the hands of properly trained medical and/or nursing staff who are qualified to assess and manage an airway obstruction and qualified to intubate patients," and that it was particularly "crucial" in a nonhospital setting that the nurse be so qualified. As discussed, there has been no showing that the blood clot in the airway was not a potential byproduct of the procedure. It makes

eminent sense that certain precautions would be necessary in the event that such a situation arose. Plaintiffs' expert's affidavit thus satisfied their burden of raising a question of fact as to whether "the doctor deviated from accepted medical practice and also [whether] the alleged deviation proximately caused [decedent's] injury" (*Dallas-Stephenson v Waisman*, 39 AD3d 303, 306-307 [2007], citing *Koeppel v Park*, 228 AD2d 288, 289 [1996]). Thus, in view of the conflicting expert affidavits, "issues of fact and credibility [are raised] that cannot be resolved on a motion for summary judgment" (*Bradley v Soundview Healthcenter*, 4 AD3d 194, 194 [2004]; *Lewis v Capalbo*, 280 AD2d 257, 258-260 [2001]).

Indeed, there are also issues of fact as to whether Dr. Subbaro ever discussed with the nurse whether she was qualified to intubate patients. She denies having any conversation about this particular patient, and also stated that she did not know how to intubate a patient generally. Since Dr. Subbaro suggests otherwise, credibility issues arise.

The motion court granted defendant's motion with the observation that there was a threshold question of law as to whether Dr. Subbaro owed the decedent a duty of care, and concluded that he did not since the nurse was an agent of Dr. Sachs, not Dr. Subbaro. It then reasoned that after leaving instructions with the nurse for the patient's care, he was free to leave because nothing indicated that he should have been concerned about the decedent's postoperative status, or the nurse's ability to care for her.

Clearly, whether a duty of care is owed in the first instance "is a question for the court, and generally not an appropriate subject for expert opinion" (*Dallas-Stephenson v Waisman*, 39 AD3d at 307). The nature of the duty, however, is a different issue. The law generally permits the medical profession to establish what the standard is (*Topel v Long Is. Jewish Med. Ctr.*, 55 NY2d 682, 689 [1981]). Once the existence of a duty has been established, resort to an expert is usually necessary.

> "To establish what the existing standard is or that there has been a departure from it, because laymen ordinarily are not deemed possessed of a sufficient knowledge, training or experience to have attained the competence to testify on this subject, a plaintiff nearly always will be required to produce expert testimony" (*id.* at 690).

In certain circumstances, the doctor's general duty of care "may be limited to those medical functions undertaken by the

physician and relied on by the patient" (*Wasserman v Staten Is. Radiological Assoc.*, 2 AD3d 713, 714 [2003] [internal quotation marks and citations omitted]). For instance, in *Huffman v Linkow Inst. for Advanced Implantology, Reconstructive & Aesthetic Maxillo-Facial Surgery* (35 AD3d 214 [2006]), this Court held that the plaintiff's primary dentist owed no duty to plaintiff with respect to extensive reconstructive surgery performed by an oral surgeon on her upper jaw. The dentist had averred that he "neither participated in nor was responsible for the surgical aspects of plaintiff's treatment," but provided only subsequent postsurgical treatment which comported with good and accepted dental practice (*id.* at 215, 216). Although a dental expert opined that the dentist should have coordinated treatment with the oral surgeon and created a stent, this Court concluded that the dentist's duty was limited to the medical functions which he undertook (*id.* at 217).

In this case, however, the claim that Dr. Subbaro did not owe any postoperative duty is belied by his own testimony in which he stated that he transferred decedent to the recovery room and to the nurse, observed the monitors, inquired of the nurse as to the condition of the patient, spoke to the patient, and, before leaving, advised the nurse to call him if she needed anything. His duty of care clearly expanded past the immediacy of the procedure. As was observed in *Dallas-Stephenson v Waisman*, "a doctor who actually treats a patient has 'a duty of care' toward that patient" (39 AD3d at 307, quoting *McNulty v City of New York*, 100 NY2d 227, 232 [2003]). How long after the procedure the duty expanded is a jury question that will turn on the jury's assessment of the experts' testimony, but that issue is not before us. We address only whether a duty existed, and find that it did.

Dr. Subbaro also argues that plaintiffs are, in effect, seeking to hold him vicariously liable for the nurse's negligence, even though he was only an independent contractor with no responsibility for hiring the nurse and no authority to control her. Defendant is correct that he could not be held liable on a vicarious liability theory for acts which were not within the scope of his responsibility. Here, however, liability is based on the duty of care owed by Dr. Subbaro, as the treating anesthesiologist, directly to the patient, even if he delegated another to act on his behalf. Defendant suggests that it would impose an inappropriate burden on a doctor to require him to make inquiry concerning the qualifications of other medical staff in the office, but

"[i]t is well established that a doctor who undertakes to examine and treat a patient (thus creating a doctor-patient relationship) and then abandons the patient may be held liable for medical malpractice" (*Lewis v Capalbo*, 280 AD2d at 258). Whether defendant abandoned the patient in dereliction of his responsibilities is a jury issue.

Accordingly, the order of the Supreme Court, New York County (Sheila Abdus-Salaam, J.), entered February 21, 2008, which granted the motion of defendant Dr. Madhavarao Subbaro for summary judgment dismissing the complaint as against him, should be reversed, on the law, without costs, the motion denied and the complaint reinstated.

BUCKLEY, MOSKOWITZ and RENWICK, JJ., concur.

Order, Supreme Court, New York County, entered February 21, 2008, reversed, on the law, without costs, the motion denied and the complaint reinstated.