OPINION OF THE COURT
Catterson, J.
In this medical malpractice action, we are asked to determine whether the plaintiffs primary care physician had any duty to supervise or override a course of treatment initiated by another physician actively treating the plaintiff. In this case, we find that the motion court erred in finding that the defendant, Elizabeth Beautyman, M.D., as primary care physician, had an independent duty to assess the plaintiffs condition and order *158 diagnostic testing such as a biopsy. On the contrary, as set forth more fully below, case law supports the defendant’s position that her status as the plaintiffs primary care physician is not dispositive as to whether a duty exists in this case. Moreover, where no duty is found to exist, the opinion of plaintiffs expert that the defendant deviated from the standard of accepted medical practice is irrelevant.
The following facts are undisputed: On August 4, 2005, the plaintiff, Dr. Ruth Burtman, a 43-year-old licensed psychologist, saw the defendant Dr. Beautyman, an internist and primary care physician for the first time. At the time of the plaintiffs first visit, she was three months pregnant and already under the care of defendant West Care Associates (hereinafter referred to as West Care), a rotating group obstetrical practice, which included the defendant doctors Robin Brown and Hope Danger. The plaintiff had been a patient at West Care since 1997. In 1999, she was treated by Dr. Brown and West Care for an underarm mass. At the time, Dr. Brown had ordered a tissue sample and subsequently the mass was found to be a benign lipoma.
Prior to the plaintiffs first visit with the defendant, she had two prenatal visits at West Care. Dr. Brown examined her on both visits, on June 30, 2005 and July 28, 2005.
On August 4, 2005, at the plaintiffs first visit with the defendant, she requested a full checkup, and the defendant performed a physical examination. The plaintiff subsequently had another prenatal checkup with Dr. Brown at West Care on August 25, 2005.
On September 20, 2005, six weeks after her first visit with the defendant, and almost a month after her prior prenatal visit with Dr. Brown, Dr. Danger examined the plaintiff and noted the presence of a mass in the upper left quadrant of her abdomen. Dr. Brown requested a sonogram which was performed on October 12, 2005.
On October 13, 2005, a radiology report was faxed to the defendant who noted that the report referred to a mass consistent with a benign fibrolipoma. She did not discuss the report with the plaintiff, or any of the plaintiffs other doctors.
It is further undisputed that the West Care doctors as part of their care of the plaintiff decided to adopt a “wait and watch” approach. They did not attempt to remove the mass while the plaintiff was pregnant because there was “no concern” as to the mass.
*159 The plaintiff had a second office visit with the defendant in January 2006 after she fell and sprained her ankle. She asked the defendant for a referral to a physical therapist. Subsequently, the plaintiff gave birth to a baby boy on February 12, 2006. She testified that by the time she gave birth, the mass had increased in size.
In June 2006, she returned to a different primary care physician whom she had previously seen in February 2005. This visit concerned a tick bite on her abdomen. It was not until the end of October 2006 that the plaintiff saw Dr. Robert Grant, a plastic surgeon, who made a diagnosis of subcutaneous masses. On December 8, 2006, Dr. Grant performed the excision of the two masses. The pathology report of December 19, 2006, showed that the 10cm left quadrant mass was an “atypical lipoma,” suggesting a malignancy. On January 6 2007, a surgical oncologist at Memorial Sloan Kettering, performed a “wide radical excision of th[e] area.”
The plaintiff commenced the instant medical malpractice action on or about January 13, 2008, against, inter alia, defendant Dr. Beautyman, the obstetricans at West Care, and West Side Radiology. With respect to Dr. Beautyman (hereinafter referred to as the defendant), the plaintiff alleged departures from good and accepted standards of practice. The plaintiff claims the defendant failed to properly examine, test, diagnose and treat her for a left upper-quadrant abdominal soft tissue mass; specifically, that the defendant failed to order a biopsy which would have revealed that her condition was a malignant liposarcoma. The plaintiff claims that as a result she was deprived of the option of less radical and invasive surgery.
Upon completion of discovery, virtually all the defendants moved for summary judgment. The court granted the summary judgment motion of the individual doctors in the obstetrical practice because the plaintiff failed to oppose their summary judgment motion. The court denied Dr. Beautyman’s summary judgment motion.
In a decision entered November 22, 2010, the court found that questions of fact existed as to whether the defendant had carried out a thorough abdominal examination on August 4, 2005 (2010 NY Slip Op 33325[U] [2010]). The court based its finding on the plaintiffs expert’s statement that “at or about this time . . . the plaintiff herself could feel these masses” (id. at *6). The court also found an issue of fact as to whether the defendant should have conducted an abdominal examination at *160 plaintiffs second office visit in January 2006 — three months after the sonogram report was faxed to her. The court held that “at the very least, [defendant] had an obligation to discuss that report with [plaintiff] . . . and to discuss with her a differential diagnosis with a suggestion for a follow-up biopsy” (id. at *7). The court based its holding primarily on the defendant’s status as the primary care physician. It relied on the opinion of the plaintiffs expert which stated that an abdominal mass was a “medical issue, rather than a gynecological” problem (id.), and thus entirely within the scope of the defendant’s duty as the primary medical physician.
This was error. The court’s holding that an issue of fact exists as to the thoroughness of the defendant’s examination of August 4, 2005 is based on an assumption that the abdominal mass was present and discernible at the time of the first visit in August 2005. This is an assumption of facts not in the evidence of record: At deposition, the plaintiff simply could not recall when and to whom she complained about the abdominal mass first — or even whether she showed it to the defendant. She testified that she showed the mass to “my doctor” identifying the doctor as Dr. Brown. She was asked: “Was Dr. Brown the first [to see the abdominal mass]?” The plaintiff answered: “I’m not sure.” As to the defendant, the plaintiff was asked: “Did you show [Dr. Beautyman the] lipoma?” Upon replying, yes, she was asked, “When?” The plaintiff replied, “I don’t know.”
It is disingenuous of the plaintiff to assert, on appeal, that “[s]ince the January 11, 2006 examination was focused on the ankle, plaintiff must have showed the mass to Dr. Beautyman on August 4, 2005.” Indeed, this is nothing more than impermissible speculation which is clearly controverted by the deposition testimony of the defendant and the West Care group of doctors, as well as by the evidence of record which shows that the first reference to any abdominal mass appeared in the plaintiff’s medical charts on September 20, 2005.
Dr. Brown testified there was no evidence of an abdominal mass during the plaintiffs visits on June 30, July 28 or even August 25. The defendant similarly testified that there was no evidence of any discernible masses at the visit on August 4th; and that the plaintiff did not come to her with a complaint, but solely for a general physical examination. There is no notation of any mass in the plaintiffs medical chart from that visit, nor any notation that the plaintiff complained about it. Neither are there any notations of an abdominal mass in the plaintiff s medi *161 cal charts at West Care at this time. This establishes that the plaintiff neither complained nor presented with any discernible abdominal mass on her documented visits at West Care on June 30, or July 28, 2005 (approximately a week before her visit with the defendant), or even on August 25 (three weeks after the visit with the defendant) during an examination at West Care. Moreover, there is no expert affidavit in the record stating that an abdominal mass of the size noted on October 12 during the sonogram would have been discernible or palpable two months earlier at the plaintiffs first office visit with the defendant.
The motion court also erred in finding an issue of fact as to the thoroughness of the defendant’s examination of the plaintiff at the second office visit in January 2006. The court observed that the defendant as the primary care physician had a duty to examine plaintiffs abdomen at that visit, or “at the very least” to discuss the sonogram report and suggest a follow-up biopsy (id.). The court, thus, imposed on the defendant the duty of overseeing a course of treatment commenced by another treating physician who specifically referred the plaintiff to a different specialist to follow up on her condition. Moreover the court did so without reference to any legal authority and erroneously relied instead on the opinion of the plaintiffs expert.
We have repeatedly held that in order to reach any discussion about deviation from accepted medical practice, it is necessary first to establish the existence of a duty. (See e.g. Cregan v Sachs, 65 AD3d 101 [1st Dept 2009].) Whether a defendant doctor owes a plaintiff a duty of care is a question for the court. (McNulty v City of New York, 100 NY2d 227, 232 [2003].) It is generally not an appropriate subject for expert opinion. (Dallas-Stephenson v Waisman, 39 AD3d 303 [1st Dept 2007].)
In this case, the defendant asserts that the dispositive factor in ascertaining duty is not the defendant’s primary care physician status, but the extent to which the defendant advised, and the plaintiff relied on advice about the abdominal mass. Well-established precedent supports this view. (See Maggio v Werner, 213 AD2d 883, 884 [3d Dept 1995], citing Markley v Albany Med. Ctr. Hosp., 163 AD2d 639, 640 [3d Dept 1990]; see also Wasserman v Staten Is. Radiological Assoc., 2 AD3d 713, 714 [2d Dept 2003]; Chulla v DiStefano, 242 AD2d 657 [2d Dept 1997], lv dismissed 91 NY2d 921 [1998].)
The foregoing decisions stand for the proposition that, “[although physicians owe a general duty of care to their patients, that duty may be limited to those medical functions undertaken *162 by the physician and relied upon by the patient.” (Markley, 163 AD2d at 640.) In other words, the question is whether the physician owes a duty under the circumstances of a particular scenario. (See Cregan, 65 AD3d at 110, citing Huffman v Linkow Inst. for Advanced Implantology, Reconstructive & Aesthetic Maxillo-Facial Surgery, 35 AD3d 214 [1st Dept 2006].)
Hence, in Huffman, we concluded that plaintiff’s primary dentist owed no duty to plaintiff with respect to reconstructive surgery performed by an oral surgeon because the dentist “neither participated in nor was responsible for the surgical aspects of plaintiffs treatment.” (35 AD3d at 215.) Similarly in Wasserman, the court found that defendants internist and general surgeons could not be charged with the duty to diagnose a nerve disorder in the plaintiffs ankle since “they were not involved in th[at] aspect of [plaintiffs] care.” (Wasserman, 2 AD3d at 714.)
It is interesting to note that the plaintiff cites to Maggio in support of her argument that the defendant had an all-encompassing duty to investigate the abdominal mass, discuss it with the plaintiff and make referrals for follow-up evaluation and treatment. In fact, Maggio underscores the principle that a physician’s duty is circumscribed by the medical functions undertaken by that physician. (213 AD2d at 884.) In that case, an obstetrician referred a patient under his care during pregnancy to a surgeon for evaluation of a breast lump. The surgeon wrote to the defendant that he did not see a need for direct intervention until after the pregnancy unless there was an obvious change. The patient continued to complain of pain to the defendant obstetrician who continued to advise her that she should not be concerned because “these things are common in pregnancies.” (Maggio at 884.) Subsequently, the patient was diagnosed with a carcinoma in her right breast.
The court observed that defendant had “assumed a legal duty to provide appropriate care to plaintiff when he accepted her as a patient.” (Maggio, 213 AD 2d at 884.) However, the court added: “The question here is whether that duty extended to the mass found in plaintiffs breast.” (Id.) In that case, the court denied defendant summary judgment because it found an issue of fact as to “whether defendant undertook to advise plaintiff about her condition . . . which advice was accepted and relied upon by plaintiff.” (Id.)
In this case, no triable issue of fact exists as to whether the defendant played any role in advising the plaintiff on the diagnosis or treatment of her abdominal mass. On the contrary, it is *163 indisputable, as evidenced by the radiology report in the record, that Dr. Brown of West Care ordered the sonogram, and that she was faxed the results. The report also includes notations by Dr. Brown that she discussed the results with the plaintiff. At deposition, Dr. Brown testified that she formed a differential diagnosis and set the course of treatment.
Dr. Brown ordered the sonogram because that is what “we routinely do.” Indeed, it is Dr. Brown who had sent the plaintiff for tissue sample upon finding a soft tissue mass on her left underarm in 1999. Moreover, while all the physicians who were deposed, including the defendant, agreed that only a biopsy could determine conclusively whether the mass was indeed benign, Dr. Brown further testified that because the radiology report did not raise concerns, it was decided not to do anything further until after the birth of the plaintiffs child. The plaintiff agreed with that characterization of a “wait and watch” course of treatment. Dr. Brown further testified that she had advised the plaintiff to see a breast surgeon.
Finally Dr. Brown acknowledged that the abdominal mass was monitored during the plaintiffs prenatal visits at West Care. She testified that if there was no notation about the mass in the plaintiffs charts it meant there was no significant change in size and no complaints by the plaintiff. Dr. Brown testified that a biopsy would have been recommended if there had been a significant change in size or if the plaintiff had complained about pain.
Nor did the plaintiff raise the subject of the abdominal mass with the defendant on the date of her second office visit on January 11, 2006. It was a problem-specific visit following the plaintiffs fall at a construction site. This is further evidenced by the plaintiffs testimony that she was disgruntled that she had to come into the office when all she had wanted was a referral for physical therapy over the telephone.
Consequently, notwithstanding the fact that Dr. Brown faxed a copy of the radiology results to the defendant, it is indisputable that the defendant was not involved in the setting or monitoring of the course of treatment prescribed for the plaintiffs abdominal mass. Neither Dr. Brown nor any other physician at West Care spoke to the defendant about the report. Moreover, when Dr. Brown faxed the report to the defendant, it appears from the record to have been faxed with Dr. Brown’s notation in the bottom left corner that she had called the plaintiff on October 12.
*164 Finally, the plaintiffs reliance on Daugharty v Marshall (60 AD3d 1219 [3d Dept 2009]) is misplaced. In that case, a triable issue of fact was raised when a family practitioner failed to refer the decedent to a specialist even though the decedent was also receiving care from a cardiologist. However, unlike the primary care physician in this case who saw the plaintiff only twice, in Daugharty, the family practitioner had been treating decedent for 13 years and for a number of various ailments including hypertension, coronary artery disease, compulsive obstructive pulmonary disease, arthritis, gallstones and prostate complaints. The court concluded that because the decedent made ongoing complaints to the family practitioner about abdominal pain, it was the practitioner’s duty to make the referral to a gastroenterologist.
The plaintiff, therefore, produces no legal authority for the view that a primary care physician has an independent duty to assess the course of treatment set and monitored by another physician. We decline to adopt such a view in these circumstances.
Accordingly, the order of the Supreme Court, New York County (Alice Schlesinger, J.), entered November 22, 2010, which, insofar as appealed from, denied defendant-appellant’s motion for summary judgment dismissing the complaint as against her, should be reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.