(October 25, 2016)

■ MARIA SEPULVEDA, an Infant, by Her Parents, Respondents, v ASHLESHA DAYAL, M.D., Appellant, et al., Defendants. [39 NYS3d 451]—

Order, Supreme Court, Bronx County (Stanley Green, J.), entered on or about August 6, 2014, which, to the extent appealed from, denied the part of defendants' motion that sought summary judgment dismissing the complaint as against defendant Ashlesha Dayal, M.D., affirmed, without costs.

The infant plaintiff in this case was born with a neuroblastoma tumor, and, as a result, suffered injuries, including spinal cord damage. Physicians did not detect any anomalies during prenatal ultrasounds performed at approximately 13 weeks, 19.6 weeks, and 30.9 weeks of gestation; plaintiffs claim that defendant's failure to detect the tumor in utero caused a delay in treatment, which in turn resulted in the injuries to the infant plaintiff's neurological system.

Both parties' experts proffered opinions on whether the infant plaintiff's neuroblastoma could have been discovered

before birth. One of the experts testifying on defendant's behalf opined that a physician cannot retrospectively assess the size of a tumor in utero based upon the size of the tumor at diagnosis. Moreover, the expert concluded, because neuroblastomas are extremely aggressive tumors, it was "more likely than not" undetectable during plaintiff's pregnancy. Thus, the expert opined, any testimony implying that a physician would be able to identify the size of a tumor in utero based upon the size of the tumor at diagnosis would be speculative and not generally accepted within the medical community.

Yet another expert testifying for defendant opined that there is no scientifically accepted standard of "tumor doubling times" in assessing the size and development of a neuroblastoma. Accordingly, the expert opined, any testimony relating to tumor growth and the ability to detect the size of a tumor in utero based on the size of the tumor at diagnosis would be testimony not generally accepted within the medical or scientific community.

On the other hand, one of the experts testifying on plaintiffs' behalf stated that in his opinion, with a reasonable degree of scientific certainty, the neuroblastoma was present in the infant plaintiff's body from conception and was of a size large enough to be detected on the third-trimester sonogram taken at 30.9 weeks. The basis for the expert's opinion was that, during the first two months of the infant plaintiff's life, she became unable to move her lower extremities—a deterioration that must have begun before her birth. Accordingly, the expert opined, it was "more likely than not" that the "huge" tumor was evident in the third trimester, when defendant was screening for anomalies in the developing fetus, and that it was a departure from accepted standards of medical practice for defendant to have failed to observe and diagnose the tumor in the infant plaintiff.

A second expert for plaintiffs opined that, based on the medical literature, the tumor, which was excised when the infant plaintiff was eight weeks old, was present and growing in utero. The expert cited articles showing that fetal neuroblastomas have been detected by routine prenatal sonography, and opined that the mass should have been detected before the birth—specifically, at the ultrasound performed at 30.9 weeks. Another of plaintiffs' experts testified that, based on studies involving mice, and based on the clinical behavior of the infant's "huge" tumor, the neuroblastoma was more likely than not detectable at the ultrasound performed at 30.9 weeks. Notably, although images from the scan taken at 30.9 weeks would have ordinar-

ily been saved, hospital administration told defendant, after plaintiffs filed this action, that the images could not be located.

Defendant's experts established a prima facie case that the ultrasound studies were properly interpreted and that none of defendant's acts or omissions caused the infant plaintiff's alleged injuries. In light of plaintiffs' expert opinions to the contrary, however, we cannot hold on the record presented to us that the opinions of plaintiffs' experts are not generally accepted within the medical and scientific communities. Accordingly, the motion court properly set the matter down for a *Frye* hearing (*Frye v United States*, 293 F 1013 [DC Cir 1923]) to determine (1) whether it is generally accepted in the medical and scientific communities that a physician may offer an opinion to a reasonable degree of medical certainty as to when a tumor such as the infant plaintiff's tumor would have been detectable by ultrasound examination; and (2) whether it was possible to use any formula, including a doubling formula, to assess whether a neuroblastoma would have been detectable at the ultrasound of the infant plaintiff performed at 30.9 weeks (*Lara v New York City Health & Hosps. Corp.*, 305 AD2d 106 [1st Dept 2003]).

The dissent's assertion that the opinions of plaintiffs' experts were "speculative" and "unsupported by the record" puts the cart before the horse. As noted above, plaintiffs' experts based their opinions partially on peer-reviewed, published articles stating that routine prenatal sonography had detected fetal neuroblastomas. Whether the information conveyed in these articles has gained general acceptance in the medical community, and thus provides support for the opinions of plaintiffs' experts, is precisely the topic of a *Frye* hearing. To reject the opinions of plaintiffs' experts before holding a *Frye* hearing would be to make a determination on the soundness of the experts' conclusions—a determination that would be premature without testing the reliability of the scientific evidence that plaintiffs have proffered. Concur—Saxe, Moskowitz and Feinman, JJ.

Friedman, J.P., and Renwick, J., dissent in a memorandum by Renwick, J., as follows: I disagree with the majority's conclusion that this matter is not appropriate for summary disposition. The majority agrees with the motion court, which ordered a hearing to determine whether plaintiffs experts opinions are generally accepted within the medical and scientific communities. On the contrary, I believe that plaintiffs failed to rebut defendant Dr. Dayal's prima facie showing that she had not committed medical malpractice. Accordingly, I respectfully dissent.

This matter involves allegations of medical malpractice, based on the failure to diagnose a neuroblastoma—an embryonic tumor—on the infant plaintiff while she was in utero. The complaint alleges that Drs. Mussali, Gross and Dayal, who performed scans upon plaintiff at 13 weeks, 19.6 weeks, and 30.9 weeks, respectively, failed to timely diagnose the neuroblastoma.

The motion court granted Mussali and Gross summary judgment and dismissed the claims as to the ultrasounds of August 12, 1998 and October 2, 1998, after plaintiff conceded that there was no basis for those claims. The court, however, denied Dayal summary judgment as to the ultrasound study she interpreted on December 16, 1998. Rather than granting or denying the motion on the merits, the court ordered that a hearing be held to determine whether plaintiffs' experts' opinions are generally accepted within the medical and scientific communities. Unlike the majority, which agrees with the motion court that the matter is not ready for summary disposition, I would find that the motion court improperly denied Dayal's motion for summary judgment dismissing the complaint as against her.

To succeed on her motion for summary judgment, Dayal had to make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). Failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers. If such a showing is made, the burden then shifts to the party opposing the motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact warranting a trial of the matter (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

Dayal made a prima facie showing that she had not committed malpractice. She submitted affidavits by three experts, all of whom agreed that there were no deviations from the applicable standard of care. To wit, it was appropriate that Dayal conducted a limited scan as to gestational age, and there was no basis for requiring the doctor to perform anything other than a scan to confirm gestational age versus fetal size. Dayal testified that she performed the scan and was able to visualize the spine, which is not always possible, that no abnormalities were seen, and that the fetus was moving appropriately. Dayal's experts reviewed the October 1998 anatomy scan,

taken eight weeks before the scan at issue, and averred that the tumor was not present. The experts also stated that one could not, within a reasonable degree of medical certainty, show that the tumor was visible at the time of the December 1998 third-trimester scan. The experts further stated that any attempt to work backwards from the date of diagnosis using doubling times was flawed science because no accepted doubling times for neuroblastomas exist.

The burden thus shifted to plaintiffs. Generally, the nonconclusory opinion of a qualified expert based on competent evidence that a plaintiff's injuries were the result of a defendant's deviation or departure from accepted medical practice and that such departure was a proximate cause of the injury precludes a grant of summary judgment in favor of the defendant (*see Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 [2002]; *Cregan v Sachs*, 65 AD3d 101 [1st Dept 2009]). However, general allegations of medical malpractice that are merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice are insufficient to defeat a defendant's summary judgment motion (*Alvarez*, 68 NY2d at 325; *Coronel v New York City Health & Hosps. Corp.*, 47 AD3d 456 [1st Dept 2008]).

Here, the affirmations by plaintiffs' experts are insufficient to contradict Dayal's testimony that she saw no neuroblastoma during the sonogram. To raise an issue, plaintiffs would need evidence supporting their theory that the neuroblastoma was present and of a size, at the time of the scan, that Dayal's failure to observe it was a deviation from the standard of medical care. On that point, plaintiffs' experts' opinions are speculative, vague, and unsupported by the record. Specifically, they fail to rebut defendant's experts' opinions that one cannot prove that the tumor was visible in December of 1998 by working backwards from the tumor's size at diagnosis. Plaintiffs' experts each claimed that the tumor was large enough to diagnose at 30 weeks because double-time calculation shows that the tumor grew from the time of conception to the time of diagnosis. However, none of plaintiffs' experts actually performed the double-time calculation they claim would determine the size of the tumor in December 1998. In fact, none of plaintiffs' experts state the double-rate of growth that would be applicable to neuroblastoma. This is not surprising since plaintiffs' own experts conceded that neuroblastomas grow inconsistently and can even shrink. Thus, plaintiffs' experts did not rebut defendant's experts' assertions that double-time calculation by its very nature relies on consistent, stable growth to be accurate.

In short, absent any double-time calculation, plaintiffs' experts' reliance on the fact that the tumor was "huge" when diagnosed in April 1999 is speculative as to the size it had been 126 days earlier, at the time of the sonogram, on December 16, 1998.

The majority's argument that we are "put[ting] the cart before the horse" is misguided. What we find deficient is not plaintiffs' experts' use of the scientific concept of doubling time to predict tumor size, which is not new (*see e.g. Feldman v Levine*, 90 AD3d 477 [1st Dept 2011]). *"Frye* is not concerned with the reliability of a certain expert's conclusions, but instead with whether the [expert's] deductions are based on principles that are sufficiently established to have gained general acceptance as reliable" (*Nonnon v City of New York*, 32 AD3d 91, 103 [1st Dept 2006], *affd* 9 NY3d 825, 842 [2007] [internal quotation marks omitted]; *see also Marsh v Smyth*, 12 AD3d 307, 308 [1st Dept 2004]). Here, dismissal is warranted because, as fully explained before, plaintiffs' experts' doubling-time analyses rested on speculative evidence.

Accordingly, I would reverse the order of the Supreme Court and grant Dayal's motion.