[915 NYS2d 223]

Tiffany Applewhite et al., Respondents, v Accuhealth, Inc., et al., Defendants, and Linda Russo, R.N., Appellant.

First Department, December 28, 2010

**APPEARANCES OF COUNSEL**

*Fiedelman & McGaw*, Jericho (*James K. O'Sullivan* of counsel), and *Edward Garfinkel*, Brooklyn, for appellant.

*Murray S. Axelrod*, New York City, for respondents.

**OPINION OF THE COURT**

MAZZARELLI, J.P.

Defendant Linda Russo is a registered nurse whose work is exclusively limited to the performance of home infusions of

intravenous medication. On February 21, 1998, she visited the 12-year-old plaintiff at home to administer to her a dose of methylprednisolone (Solu-Medrol). Russo worked for Accuhealth, Inc., a company which specialized in home infusions.

Solu-Medrol had been prescribed by an opthamologist who was treating plaintiff for uveitis, a vision-threatening form of eye inflammation. The physician had ordered that the medication be given for three-day periods on consecutive months. The first month that the medication was administered was January 1998, and plaintiff accepted the infusion without incident. Russo performed the infusion, which takes approximately one hour, on one of the January days. Other nurses from Accuhealth covered the other two days. Although not entirely clear from the record, it does not appear that the physician who prescribed the Solu-Medrol worked for Accuhealth.

The incident in question occurred on the day that the February series of infusions began. When Russo arrived at plaintiff's apartment, the only medical equipment she had with her was a blood pressure cuff, a stethoscope and a one-way breather, which is used during cardiopulmonary resuscitation. All of the items which Russo would need for the infusion itself, such as needles, intravenous lines, the pole to support the bag of medication and the medication itself, had been delivered directly to plaintiff's apartment in anticipation of Russo's visit. The infusion materials were shipped by Accuhealth, without Russo's involvement.

Within seconds after the Solu-Medrol began to flow into plaintiff's veins, plaintiff complained that she could not breathe. Russo testified at her deposition that she was next to plaintiff at all times and immediately stopped the drip. She said she instructed plaintiff's mother, who was observing the infusion, to call 911 and tell the operator that her daughter was having difficulty breathing and to send an ambulance immediately. Plaintiff then began to have a seizure, and Russo directed her mother to bring her a spoon with padding around it. Russo used the spoon to force plaintiff's mouth open. She then inserted the one-way breather and began breathing into plaintiff's mouth through the device. Plaintiff's condition rapidly deteriorated and she went into full respiratory, and then cardiac, arrest. Russo claims that she lowered plaintiff from the sofa, where she had been situated at the beginning of the infusion process, to the floor, where she began to administer CPR until the arrival of emergency medical services personnel. Tragically, by the time emergency responders were able to stabilize her condition,

plaintiff had suffered significant oxygen loss, which resulted in permanent brain damage, leaving her unable to eat, speak or communicate.

It is not in dispute that plaintiff's condition was caused by an allergic reaction to the Solu-Medrol, which caused her to go into anaphylactic shock. This is a known side effect of the drug. It is also not in dispute that epinephrine is a prescription drug commonly given to counteract the effects of those allergens that can cause anaphylactic shock. Russo did not have epinephrine with her on the day in question. She testified that epinephrine was not included in the box of supplies that Accuhealth had delivered to plaintiff's apartment before her arrival. She further stated that she would not have been permitted to carry epinephrine with her without a prescription.

Plaintiff's mother testified at her deposition that, when plaintiff first complained about having difficulty breathing, Russo was writing notes in the kitchen, approximately 20 feet from where plaintiff was situated in the living room. She stated that it took approximately one minute from the time she told Russo that plaintiff could not breath until Russo instructed her to call 911. She further contended that, after she brought the padded spoon to Russo and Russo commenced rescue breathing, Russo asked her to help place plaintiff in a lying position on the couch, not on the floor as Russo testified, where she performed CPR on plaintiff.

Plaintiffs commenced this action against Russo, Accuhealth, the City and its Emergency Medical Service.[1] As concerns Russo, plaintiffs' bill of particulars alleged that she committed professional malpractice by, inter alia, failing to properly supervise and attend to plaintiff, failing to properly and immediately perform CPR on plaintiff, failing to personally advise the 911 operator of the nature of the emergency, and failing to have ensured that epinephrine was available to counteract the allergic reaction which caused plaintiff's anaphylaxis.

Russo moved for summary judgment to dismiss the complaint. She primarily relied on the expert affidavit of Anne Heuser, a registered nurse. Heuser opined that Russo, in each and every aspect of her treatment of plaintiff, acted "well within the standards of good and accepted nursing practice." With respect to

---

**1.** Plaintiffs did not name the physician who prescribed the Solu-Medrol that Russo administered. Accuhealth, Inc. is no longer a party, having been dissolved in bankruptcy.

Russo's failure to have epinephrine available with which to treat plaintiff, the entirety of Heuser's opinion was as follows:

> "Furthermore, Nurse Russo was *not authorized* to carry epinephrine or an Eppi pen without a specific order from a physician. Here, neither Dr. Weiss nor Dr. Ahuja ordered epinephrine for the infant Plaintiff. It would have been a violation of good and accepted nursing practices for Nurse Russo to somehow obtain epinephrine on her own and administer it to the infant plaintiff."

In opposition to Russo's motion, plaintiffs submitted two expert affidavits. One was from Lynn Hadaway, a registered nurse from Georgia who specializes, like Russo, in home infusion therapy. Hadaway attached to her affidavit the drug monograph for Solu-Medrol, which identifies anaphylaxis as a side effect, and advises those administering the drug to "keep epinephrine immediately available." She concluded that Russo fell short of national standards for infusion therapy by failing to have the requisite knowledge about Solu-Medrol and failing to ensure the presence of epinephrine in plaintiffs' apartment on the day in question. Finally, Hadaway rendered her opinion that Russo improperly administered CPR to plaintiff on the sofa, because CPR should be properly performed on a sturdy, rigid surface.

Plaintiffs' second expert affirmation was from Michael Wajda, a medical doctor. Dr. Wajda stated that Russo was responsible for handling any complications caused by administration of Solu-Medrol to plaintiff. He stated that if Russo was not prepared to address any such eventualities on the day in question, including by not having epinephrine at her disposal, she was required not to perform the infusion. Dr. Wajda further stated that it was unclear to him whether Russo stopped the flow of Solu-Medrol immediately after plaintiff went into shock, and whether she began to give intravenous fluids to plaintiff at the same time as she did stop the medication. This infusion of liquids would have been critical, Dr. Wajda stated, to keep plaintiff's veins open to allow the maximum volume of blood to flow through them. Dr. Wajda also opined that Russo did not properly maintain plaintiff's airway.

Plaintiffs also questioned the qualifications of Heuser to act as an expert for Russo, since Heuser did not specialize in home infusion nursing. In reply, Russo submitted a supplemental affidavit from her expert, Heuser, in which she attempted to

counter plaintiffs' argument that she was not qualified to render an opinion in this case. While admitting that she did not specialize in home infusion nursing, Heuser stated that because, during her 19 years of nursing, she had worked in emergency rooms and in trauma centers, she was "more than qualified to comment on the treatment rendered by a home infusion nurse."

Supreme Court denied Russo's motion. It found that questions of fact existed as to where Russo was at the time plaintiff first complained of trouble breathing and whether her location may have rendered her incapable of intervening quickly enough in case of an emergency. The court rejected Heuser's affidavit, finding that her lack of experience as a home infusion nurse rendered her opinion meaningless in a case where the standard of care to be applied was that of a home infusion specialist and not a generalist. The court credited the affidavits of both Nurse Hadaway and Dr. Wajda, and expressly rejected Russo's argument "that [p]laintiff falls short of defeating her entitlement to summary judgment because it is irrefutable that Nurse Russo had no authority to order or administer epinephrin [*sic*]."

█ Plaintiffs' expert submissions raised triable issues as to whether Russo's alleged failure, after the onset of plaintiff's reaction, to properly maintain plaintiff's airway, to flush the IV, to perform CPR on a rigid surface, and to ensure a prompt response from emergency medical services, contributed to the severity of plaintiff's brain injury (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308, 315 [1980]). Further, Russo failed to even shift the burden to plaintiffs on the issue of whether she breached a professional duty by administering Solu-Medrol without an available supply of epinephrine.

It is basic that the party moving for summary judgment has the burden of establishing the absence of any factual issues to entitle it to judgment as a matter of law. Here, it was Russo's obligation to establish the absence of a departure from good and accepted practice (*see Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). However, Heuser's affidavit is completely silent regarding plaintiffs' allegation that Russo had a duty to request a dose of epinephrine before beginning to infuse plaintiff with Solu-Medrol. As such, Heuser's affidavit is insufficient to shift the burden to plaintiffs to submit evidence creating an issue of fact (*see Wasserman v Carella*, 307 AD2d 225, 226 [2003]). To the extent that Heuser states that Russo "acted in accordance with good and accepted nursing practices," without addressing specific allegations, such bare conclusory statements are also insufficient (*id.*).

The concurrence has confused the parties' respective burdens on a summary judgment motion by arguing that Russo should have been awarded summary judgment because plaintiffs failed to establish that it is common practice for Solu-Medrol infusion kits to include epinephrine. It ignores the fact that even Heuser's affidavit, which the motion court correctly determined, in relevant part, lacked probative value, does not state that epinephrine is *not* ordinarily prescribed by physicians in conjunction with the administration of Solu-Medrol. Rather, it states only that Russo would have needed a specific order from a doctor. This statement is clearly insufficient to shift any burden to plaintiffs.

The statements in Heuser's affidavit regarding Russo's duty to secure epinephrine failed to shift the burden on that issue for the additional reason that, as the motion court correctly determined, Heuser was not qualified to render such an opinion. We note that our review of this issue is limited to whether the court providently exercised its discretion, and that we will not disturb its determination "absent a serious mistake or an error of law" (*Guzman v 4030 Bronx Blvd. Assoc. L.L.C.*, 54 AD3d 42, 49 [2008]). Here, the motion court was correct as Heuser did not have any experience in home infusion. There is no evidence that her general nursing experience afforded her any insight into those skills unique to home infusion nurses. That absence is critical here. Because none of the experience Heuser did purport to have was necessarily transferable to the issue of whether Russo should have carried out the infusion on plaintiff without having epinephrine available, and because she failed to lay any other "foundation . . . tending to support the reliability of" her opinion, the motion court properly rejected Heuser's affidavit when considering the epinephrine issue (*see Behar v Coren*, 21 AD3d 1045, 1047 [2005], *lv denied* 6 NY3d 705 [2006]).[2]

Even if Heuser had succeeded in shifting her burden on the epinephrine issue, plaintiffs amply demonstrated the existence of an issue of fact. Plaintiffs do not contend, as Russo suggests,

---

**2.** We disagree with the court to the extent that it refused to consider those portions of Heuser's affidavit which opine on such general nursing skills as the proper way to maintain an airway, to flush an IV and to perform CPR. Heuser's general nursing experience was sufficient to qualify her to discuss those basic nursing functions (*Behar* at 1046-1047). However, the court's error is of no consequence because, as stated above, plaintiffs introduced sufficient evidence to create an issue of fact as to whether Russo properly performed those skills.

that Russo should have prescribed epinephrine herself or otherwise obtained it without the proper authorization. Rather, plaintiffs claim that Russo had a duty to inquire if epinephrine was available before she proceeded with the infusion. To impose such a duty on a nurse is not, as Russo also suggests, to grant the nurse a license to practice medicine. Rather, it recognizes the critical role of nurses as a check against medical error.

The Court of Appeals discussed the crucial job nurses perform in *Bleiler v Bodnar* (65 NY2d 65 [1985]). In *Bleiler*, the plaintiff suffered an eye injury at work and went to the emergency room the next day. An emergency room nurse and the supervising physician both separately took medical histories which failed to elicit information that would have led to proper treatment of the eye. The plaintiff sought to hold the hospital vicariously liable for the misconduct of the doctor and the nurse. The Court of Appeals had to consider whether the applicable statute of limitations was for negligence or for medical malpractice. In finding that the latter limitations period applied with respect to the conduct of both the doctor and the nurse, the Court observed that

> "[w]hile courts have in the past held that a nurse could be liable for negligence, but not for malpractice, the role of the registered nurse has changed, in the last few decades, from that of a passive, servile employee to that of an assertive, decisive health care provider. Today, the professional nurse monitors complex physiological data, operates sophisticated lifesaving equipment, and coordinates the delivery of a myriad of patient services. As a result, the reasonably prudent nurse no longer waits for and blindly follows physicians' orders" (65 NY2d at 71 [internal quotation marks and citations omitted]).

The court concluded that by not taking a proper medical history of the plaintiff, the nurse failed to carry out her "role as an integral part of the process of rendering medical treatment to a patient" (*id.* at 72).

Here, there is no evidence that the physician who prescribed the Solu-Medrol affirmatively decided that it was unnecessary to direct that epinephrine be included in the supply box that was delivered to plaintiffs' apartment. Consequently, it cannot be said as a matter of law that Russo was simply carrying out a prescribed treatment plan. If, on the other hand, the physician's failure to ensure the availability of epinephrine was an

oversight, or the result of a mistaken assumption by the doctor that Accuhealth would independently procure an epinephrine prescription, Russo could have served as a critical backstop by assuring that epinephrine was available. After all, the injuries plaintiff suffered were a medically recognized consequence of the infusion. Again, the Court of Appeals in *Bleiler* identified one of the crucial roles of the modern professional nurse as that of one who "coordinates the delivery of a myriad of patient services" (65 NY2d at 71 [internal quotation marks and citation omitted]). Here, the allegation is that Russo failed in that role, and that her actions constituted those of "a passive, servile employee" (*id.* [internal quotation marks and citation omitted]) and not those of "an assertive, decisive health care provider" (*id.* [internal quotation marks and citation omitted]). Plaintiffs have certainly submitted sufficient evidence to require that a jury determine the issue.

Contrary to the concurrence's claim, we are not suggesting that, in all cases, a professional registered nurse must "possess the same knowledge of pharmaceuticals that we properly demand of those who are authorized to prescribe them." Nor are we creating any new duty for registered professional nurses. Rather, our holding is informed by the fact that, in this case, as concerns the lack of epinephrine, plaintiffs' allegation of malpractice does not depend on a finding that Russo should have taken extraordinary steps or made inquiry into an area of medicine that far exceeded the knowledge ordinarily expected of a nurse. To the contrary, the notion that a nurse should be aware of the importance of having epinephrine available when administering medication in the home setting is not a difficult one to embrace. After all, the fact that epinephrine is the antidote to anaphylaxis is widely known among laypeople. Indeed, many individuals who care for a child with severe allergies, or who have a spouse or partner prone to anaphylactic shock, are known to carry a dose of epinephrine in pockets and purses, regardless of their medical background.

Moreover, the administration of epinephrine is far from a radical procedure. Rather, the medicine is easily transportable in the form of auto-injector devices, commonly known as "epipens," and apparently easily administered, as evidenced by the fact that the Legislature has expressly authorized summer camp personnel to use them (Public Health Law § 3000-c). This fact further undermines the already inconsequential statement by the concurrence that "[t]he monograph Hadaway cited, saying

that epinephrine *should* always be available when Solu-Medrol is administered, does not establish that this recommendation has actually been followed in the general practice of home infusion therapy." In other words, the idea of having a dose of epinephrine available in cases where, as here, a person may encounter a substance known to cause anaphylaxis is so obvious that common sense would seem to dictate that it be routine. Indeed, it is so intuitive, even to a layperson, that the antidote for anaphylaxis should accompany a medicine known to cause anaphylaxis, that lack of empirical proof that this "recommendation" is "followed" by the medical community should hardly compel the dismissal of the complaint. This is especially true in this case, where defendant has not offered any plausible reason why a physician would *not* prescribe epinephrine for use by a home infusion nurse if, in her role as "coordinat[or of] the delivery of . . . patient services" (*Bleiler*, 65 NY2d at 71 [internal quotation marks and citation omitted]), the nurse suggested that it was medically indicated.

■ The concurrence invokes Education Law § 6902 in arguing that, by holding that Russo should have inquired into the availability of epinephrine, we are holding her to a standard in excess of what is required by statute. As conceded by the concurrence, however, the definition of the practice of the profession of nursing as a registered professional nurse, as provided by section 6902, "encompasses a wide variety of tasks," including:

> "diagnosing and treating human responses to actual or potential health problems through such services as casefinding, health teaching, health counseling, and *provision of care supportive to or restorative of life and well-being*, and executing medical regimens prescribed by a licensed physician, dentist or other licensed health care provider legally authorized under this title and in accordance with the commissioner's regulations" (§ 6902 [1] [emphasis added]).

That this definition does not mention prescription medication is irrelevant to the issues in this case. Certainly that part of a registered professional nurse's job which the Legislature has identified as the "provision of care supportive to or restorative of life and well-being" is broad enough to embrace inquiring into the availability of epinephrine during home infusions of medications known to cause anaphylaxis. Moreover, we note that the definition of "nurse practitioner" also does not include any mention of prescription medication (Education Law § 6902

[3] [a]). Although we recognize that nurse practitioners are separately authorized to prescribe medicine under certain circumstances (Education Law § 6902 [3] [b]), it is evident that these definitional sections were not intended to provide exhaustive descriptions of what nurses can and cannot do.

That a home infusion nurse live up to the standards established by the Court of Appeals in *Bleiler* is critical. Home infusion nurses work without the resources normally available in a medical office or hospital setting. The issue in this case is what steps must a nurse with no readily available support take to ensure that any and all reasonably foreseeable problems can be addressed so as to minimize patient harm. Nurses have become a crucial element in the provision of medical care. As recognized by the Court of Appeals in *Bleiler*, no longer are they automatons who operate by rote, but professionals who are expected to be proactive in their work, while always deferring to the reasonable directives of the doctors they work with. There is sufficient evidence in this record that Russo failed to comport herself in accordance with this more modern model of nursing, and that if she had, the disaster that befell plaintiff and her family could have been averted. Consequently, we find that the motion court correctly denied Russo summary judgment.

Accordingly, the order of the Supreme Court, Bronx County (Douglas E. McKeon, J.), entered on or about October 29, 2009, which denied defendant Linda Russo's motion for summary judgment dismissing the complaint and all cross claims as against her, should be affirmed, without costs.

SAXE, J. (concurring in part and dissenting in part). This appeal concerns the scope of the duty owed by a nurse to a patient, a relatively new and developing area of tort law. As the Court of Appeals has noted in *Bleiler v Bodnar* (65 NY2d 65 [1985]),

> "the role of the registered nurse has changed, in the last few decades, from that of a passive, servile employee to that of an assertive, decisive health care provider. Today, the professional nurse monitors complex physiological data, operates sophisticated lifesaving equipment, and coordinates the delivery of a myriad of patient services. As a result, the reasonably prudent nurse no longer waits for and blindly follows physicians' orders" (*id.* at 71 [internal quotation marks and citations omitted]).

But, though the practice of nursing today entails greater re-

sponsibilities than ever before, it is inappropriate to impose on nurses duties that belong within the sphere of obligations assigned by statute to medical doctors. Yet, part of the majority's ruling today holds, in effect, that it is a nurse's legal duty to oversee or supervise the work of physicians, by requiring that they make an affirmative inquiry where a physician has prescribed for the nurse's patient a medication which carries with it a risk of anaphylaxis, but has not prescribed epinephrine to accompany that medication. While initially this holding seems innocuous, because the duty is framed as merely a duty of inquiry, it imposes a duty that neither statute, regulation, nor case law has previously imposed, a duty that is better left to be imposed, if it is to be imposed at all, by statute or regulation, rather than by common law. Moreover, the imposition of this duty of inquiry on the administering nurse is particularly unfair where the plaintiffs have not even claimed that the prescribing physician was negligent for failing to prescribe epinephrine to accompany the prescribed medication. I therefore dissent from that aspect of the majority's ruling.

This tragic case concerns 12-year-old Tiffany Applewhite, who suffered catastrophic brain injury on February 21, 1998 as the result of an anaphylactic shock reaction to medication being administered in her home through intravenous infusion by defendant registered nurse, Linda Russo, to treat an eye inflammation. While plaintiffs sued the home health care agency that sent Nurse Russo, as well as the Emergency Medical Service (EMS) and the City of New York, this appeal considers only the claim brought directly against Nurse Russo. The theories of liability offered in support of the claim against Nurse Russo were that she failed to take various necessary steps at the necessary speed in response to Tiffany's reaction, and that she failed to ensure that epinephrine was available before beginning the intravenous infusion.

Nurse Russo's motion for summary judgment was denied by the motion court. This court now affirms. I write separately because although I concur in the result that summary judgment should be denied, in view of the issues of fact as to whether Nurse Russo's actions in response to Tiffany's reaction comported with professional standards of care, I strongly disagree with the aspect of the ruling permitting plaintiffs to proceed on the theory that Nurse Russo should have ensured that an epi-pen was available. The question of whether Nurse Russo may be charged with that duty is for the court; I submit that as a matter of law, Nurse Russo should not be held liable

based upon the failure to inquire regarding the lack of an epi-pen.

Accuhealth, Inc. was a home health agency which provided various nursing services to clients in their homes pursuant to orders by the patients' physicians. One such service was home infusion therapy, for which Accuhealth sent nurses throughout the New York metropolitan area to administer intravenous medication at patients' homes. The necessary medical supplies, including prescribed medications, would be dispensed by Accuhealth's pharmacists and sent to the patient's home in advance. While Accuhealth employed nurses at its headquarters, as well as field nurses and pharmacists, the record contains no evidence as to whether Accuhealth employed its own physicians to consult about the prescribing physician's orders. The day before the services were to be performed on a patient, the nurse would receive the doctor's orders and the "demographic" information via fax, including the patient's name, address, age, primary diagnosis and type of therapy to be administered. Upon arriving at the location, the nurse would open the package of supplies and perform the prescribed procedure. Defendant Linda Russo was one of the nurses employed by Accuhealth to perform intravenous infusions and provide other home nursing services.

Tiffany Applewhite had been diagnosed with uveitis, an inflammation of the sclera, or the whites of the eye. Solu-Medrol, a steroid medication, was prescribed for her by Dr. Ahuja, at the direction of Dr. Michael Weiss, director of the Uveitis Service at the Harkness Eye Institute of Columbia Presbyterian; it was to be administered intravenously each day for three consecutive days, with a second course to run for two consecutive days one month later. Tiffany's first course of the Solu-Medrol was administered at her apartment in the Bronx by Accuhealth nurses from January 22 to January 24, 1998 without incident or any adverse reaction. Different nurses administered the first course of treatment on each of the three days; Nurse Russo was one of them.

The second course of medication began on February 21, 1998. Nurse Russo arrived at plaintiffs' apartment at about 11:00 A.M. on that day. Tiffany's mother, Samantha Applewhite, testified at her deposition that Nurse Russo spent about 5 to 10 minutes setting up the equipment to administer the Solu-Medrol. Nurse Russo explained that to administer the drug she had to open a vein and insert a "hep lock," a device that ensured that the blood would not clot, and then begin administering the medica-

tion. This was accomplished in a routine manner without incident. After this point, the facts are disputed. Ms. Applewhite testified that Nurse Russo went to the kitchen, about 20 feet away, to take notes, while Nurse Russo testified that she remained next to Tiffany until the girl cried out for help. Both women claim that Tiffany complained of breathing difficulties, screaming "Mommy, I can't breathe!" but Nurse Russo claims that this happened after three to five seconds, while Ms. Applewhite claims the IV was running for about 10 minutes before Tiffany complained she could not breathe. Ms. Applewhite agrees that immediately after Tiffany complained, Nurse Russo approached Tiffany and shut off the IV.

Within a minute Nurse Russo told Ms. Applewhite to call 911. Ms. Applewhite's deposition states Nurse Russo told her to tell the 911 operator to send an ambulance because Tiffany was having a "reaction." Ms. Applewhite's affidavit, on the other hand, alleged that Nurse Russo told her to tell the operator that Tiffany was "having difficulty breathing" and that Nurse Russo did not tell her to say anything about Tiffany having an allergic reaction. By the time the call was over, Tiffany was unconscious. Ms. Applewhite testified that Nurse Russo asked her to help lay Tiffany on the sofa and get a padded spoon to open Tiffany's mouth. Nurse Russo did so, opened Tiffany's mouth using the spoon to "keep her tongue from going into her throat" and began CPR.

The accounts differ as to where the CPR began. Nurse Russo claims she immediately moved Tiffany from the couch to the floor. Ms. Applewhite claims that Nurse Russo began CPR on the sofa and that Tiffany was not moved to the floor until about five minutes later, when two-person CPR began when "an ambulance arrived with two EMT's" and a female EMT began CPR alongside Nurse Russo. Ms. Applewhite's version is corroborated by the New York City Fire Department ambulance call report, which stated "12 year old female . . . found supine on couch."

According to Ms. Applewhite, two minutes after the first 911 call, she made a second 911 call at the request of Nurse Russo. About 20 minutes after Tiffany first claimed she could not breathe, a "male and [a] female" arrived from "[t]he first ambulance." The male went downstairs to call EMS. The female commenced two-person CPR with Nurse Russo. When the male returned about 15 minutes later he was with four EMS responders from two other ambulances, according to Ms. Applewhite.

They then took over Tiffany's treatment, putting an oxygen mask on her and taking her downstairs to the ambulance.

Ms. Applewhite brought suit on behalf of Tiffany against Nurse Russo, Accuhealth, the Emergency Medical Service and the City of New York for her catastrophic brain injuries. No claim was made against the physician who prescribed the Solu-Medrol that was administered on February 21, 1998.[1]

Nurse Russo moved for summary judgment pursuant to CPLR 3212, offering in support her own affidavit and that of her expert, Anne Heuser, R.N., asserting that the treatment Nurse Russo rendered to Tiffany was "well within the standards of good and accepted nursing practices." According to Heuser's affidavit, it was proper for Nurse Russo to direct Ms. Applewhite to call 911 and inform them of Tiffany's inability to breathe, as well as to promptly open an airway and administer CPR. Heuser noted that Nurse Russo was not authorized to carry the medical antidote to anaphylactic shock, epinephrine, without a physician's order, and there was "nothing else" that Nurse Russo could have done.

In opposition, plaintiffs submitted an affidavit from their own expert, Lynn Hadaway R.N., who is licensed in Georgia. Hadaway's affidavit attacked Nurse Russo's qualifications on the grounds that she did not possess a "Certified Registered Nurse Intravenous" (CRNI) credential. Hadaway also cited a monograph stating that anaphylaxis is a side effect of Solu-Medrol and epinephrine should be kept "immediately available." Hadaway further criticized Nurse Russo's failure to treat Tiffany with epinephrine and intravenous fluids and her failure to perform CPR on a "sturdy, rigid surface."

Plaintiffs also submitted the affirmation of Dr. Michael Wajda, an anesthesiologist, who stated that lack of oxygen can cause irreversible brain damage within five to seven minutes. Wajda criticized Nurse Russo's alleged failures to administer epinephrine, properly maintain the patient's airway, and

---

1. The action was stayed for several years due to the bankruptcy of Accuhealth and its insurer, which was not covered by the New York Property/Casualty Insurance Security Fund. Accuhealth's general liability policy was written by Reliance Insurance Company of Illinois, a non-admitted carrier not licensed to do business in New York State. Accordingly, there was no coverage provided to Accuhealth for the loss under the New York Property/Casualty Insurance Security Fund under Insurance Law § 7603 because the Property/Casualty Fund is only used to pay claims from the insolvency of authorized insurers, and "authorized" insurers are those licensed to do business in New York.

administer IV fluids to enhance blood vessel dilation. Wajda stated that it was unclear whether Nurse Russo immediately stopped the administration of Solu-Medrol when Tiffany began to have anaphylaxis symptoms. He also asserted that Nurse Russo should have brought Tiffany to the hospital herself rather than waiting for the first responders even though Tiffany was on the fifth floor of an apartment building, stating

> "if an emergency hospital facility was only minutes away from the scene, then in my medical opinion, Tiffany most probably would have had a better outcome going immediately to the hospital, rather than waiting with the Nurse and first responders, who did not provide the proper initial therapy for anaphylaxis."

In reply, Nurse Russo disputes plaintiffs' position that it would have taken "minutes" for Nurse Russo to get from the living room to Tiffany, since—even if Nurse Russo had been in the kitchen, as Ms. Applewhite claims—it would only have taken a few seconds. Nurse Russo also pointed out that even assuming that she began CPR while Tiffany was on the couch, as plaintiffs contend, plaintiffs submitted no evidence as to the quality of the couch so as to establish that it was an inappropriate surface on which to perform CPR. She further argues the other alleged departures from the standard of care were not shown to constitute proximate causes of Tiffany's injury. Finally, Nurse Russo disputes plaintiffs' challenge to her expert, offering an affidavit by Heuser defending her qualifications, asserting that she had 19 years of experience as a registered nurse and had worked in trauma centers and emergency rooms in various New York hospitals and therefore was more than qualified as an expert witness. Heuser's affidavit also countered Hadaway's challenge to her expertise on the basis of her lack of CRNI certification, pointing out that CRNI is not required for an RN to administer home infusion therapy, in that the American Board of Nursing Specialties only accredited this designation in July 2006, more than eight years after the events in question.

The motion court denied Nurse Russo's motion for summary judgment on various grounds. The court held that a question of fact was presented as to whether by situating herself in the next room Nurse Russo failed to properly evaluate Tiffany's condition and failed to recognize her reaction and stop the IV as quickly as possible. The motion court found that Nurse Russo's expert, Nurse Heuser, was not qualified to give an expert

opinion because Nurse Russo must be judged according to the standards of a specialist in home infusion nursing, and Heuser was not a home infusion nurse. The court also rejected Nurse Russo's argument that since a nurse may not order or administer epinephrine, she may not be held liable for that failure; the court pointed to a monograph cited by Hadaway which claimed that epinephrine should be kept immediately available.

The majority affirms, finding issues of fact as to whether Nurse Russo breached a duty of care by failing to inquire regarding the availability of epinephrine, whether she properly maintained Tiffany's airway and whether she failed to properly flush the IV. As stated earlier, while I agree with the remainder of the majority's reasoning, I take issue with this Court's ruling to the extent it allows plaintiffs to proceed in reliance on the theory that Nurse Russo breached a duty to inquire regarding the failure to provide epinephrine. Finally, because the matter will proceed to trial, I would also reject the motion court's ruling regarding Nurse Heuser's qualifications to give an expert opinion in regard to Nurse Russo's handling of Tiffany's case.

While nursing malpractice is a relatively new area of law (see *Bleiler v Bodnar*, 65 NY2d 65 [1985], *supra*), there is a long history of claims being sustained against hospitals based upon nurses' failures, usually entailing the failure to follow nursing plans or medical orders (see *Toth v Community Hosp. at Glen Cove*, 22 NY2d 255 [1968]; *Pacio v Franklin Hosp.*, 63 AD3d 1130 [2009], *affg* 2008 NY Slip Op 31702[U] [Sup Ct, Nassau County 2008]), failing to properly take the patient's history (see e.g. *Bleiler v Bodnar*, 65 NY2d at 72), or failing to physically protect patients from injury in their weakened or compromised state (see e.g. *N.X. v Cabrini Med. Ctr.*, 97 NY2d 247 [2002]). However, the present case goes well beyond these typical grounds for liability; here, liability is sought against a nurse based on the nurse's claimed failure to properly exercise her independent professional skills and judgment in treating the patient—in particular, in failing to question the prescribing physician's failure to include a prescription for epinephrine to be used in the event the patient experienced an anaphylactic reaction to the medication.

For all malpractice claims, the critical issue is the existence and scope of the defendant's duty. There is no dispute here that Nurse Russo owed a duty of care to her patient. It is the nature and extent of that duty that must be determined.

I recognize that where a defendant owes a professional duty to a plaintiff, the scope of that duty is often determined by courts with the input of experts in the same field.

> "The law generally permits the medical profession to establish what the standard is (*Topel v Long Is. Jewish Med. Ctr.*, 55 NY2d 682, 689 [1981]). Once the existence of a duty has been established, resort to an expert is usually necessary.
>
> 'To establish what the existing standard is or that there has been a departure from it, because laymen ordinarily are not deemed possessed of a sufficient knowledge, training or experience to have attained the competence to testify on this subject, a plaintiff nearly always will be required to produce expert testimony' " (*Cregan v Sachs*, 65 AD3d 101, 109 [2009], quoting *Topel*, 55 NY2d at 690).

However, where, as here, statutes define and limit the parameters of the professional's responsibilities in a particular area, courts should hesitate to use their authority to impose, through case law, duties previously not contemplated by the controlling statutory authorities.

Education Law § 6902 defines the practice of nursing. The statutory definition encompasses a wide variety of tasks:

> "casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens prescribed by a licensed physician, dentist or other licensed health care provider legally authorized under this title and in accordance with the commissioner's regulations" (§ 6902 [1]).

The tasks for which a registered professional nurse may be held responsible in this state do not include prescribing medication, a responsibility which the Education Law leaves as the province of medical doctors, or other appropriately credentialed professionals such as those nurses who have received advanced certification as "nurse practitioners" and have the necessary additional credentials and supervision (Education Law § 6902 [3] [b]; § 6909 [4]). It is undisputed that epinephrine is available only by prescription; indeed, it would have been illegal for Nurse Russo to dispense epinephrine without a physician's order (Education Law § 6902; Public Health Law § 3000-c).

Even though prescribing medication is the responsibility of physicians, and is not within nurses' statutorily-defined sphere

of responsibility, the majority today in effect imposes on nurses a requirement that they possess the same knowledge of pharmaceuticals that we properly demand of those who are authorized to prescribe them. A new duty of inquiry would blur the line between physicians and nurses, and substantially extend the responsibilities of registered professional nurses. Indeed, it cannot be reconciled with the long-standing rule that nurses are normally protected from liability if they are merely following a physician's orders, except where the physician's orders are clearly contraindicated by normal practice (*see Toth v Community Hosp. at Glen Cove*, 22 NY2d at 265 n 3; *Warney v Haddad*, 237 AD2d 123 [1997]). While *Bleiler* acknowledged the increasingly complex duties of modern nurses, it did not go so far as to permit courts to require nurses to act as the de facto supervisors of prescribing physicians.

The majority suggests that the new duty it is imposing on nurses is minimal and acceptable, in view of the common knowledge that epinephrine is an antidote to anaphylaxis, and of the widespread use of epi-pens. Of course, it is common knowledge that many drugs can cause severe allergic reactions, and many people with known life-threatening allergies have been prescribed epinephrine as an antidote to carry with them. But, that fact does not justify a legal requirement that a nurse, before administering such drugs, must question the prescribing physician as to whether he or she failed to consider the need for a precautionary dose of epinephrine. In imposing that duty of inquiry, we have undertaken a task that courts are not equipped to handle: that of defining the circumstances in which nurses have the obligation to challenge a physician's prescription.

A new affirmative duty on the part of a nurse to inquire as to whether the prescribing physician overlooked the need for epinephrine, if it is to be imposed at all, should be imposed by the legislative bodies that define those responsibilities, rather than by the common law.

Moreover, even if we use the opinions of the parties' experts to formulate our own rule regarding whether a home infusion nurse has a duty to inquire as to whether a treatment for a possible anaphylactic reaction must be on hand, I disagree with the motion court's ruling rejecting the qualifications of defendant's expert and accepting the view of plaintiffs' expert.

In the context of a defendant's motion for summary judgment dismissing a malpractice claim, the defendant must initially establish a prima facie right to relief through an expert's opinion

responding to the essential factual allegations of the complaint (*Cregan v Sachs*, 65 AD3d at 108). Contrary to the motion court's assertion, defendant's expert, Nurse Anne Heuser, was sufficiently qualified to give an expert opinion as to Nurse Russo's professional conduct, even though she was not a home infusion nurse.

While experts must possess the requisite skill, training, knowledge or experience to establish that their opinion is reliable, they do not have to be specialists in the same field as that of the defendant, as long as they lay the foundation to support the reliability of their opinions (*Behar v Coren*, 21 AD3d 1045, 1046-1047 [2005], *lv denied* 6 NY3d 705 [2006]). It is not required in New York that an expert witness possess a particular certification in order to be qualified as an expert as long as the expert had the requisite degree of knowledge to testify as to the tasks at issue (*see Bodensiek v Schwartz*, 292 AD2d 411 [2002]). Under New York law, the practice of all nurses, other than nurse practitioners, is governed by the same statute (Education Law § 6902). As Nurse Russo pointed out at her deposition, registered nurses working in hospitals regularly encounter anaphylactic reactions to emergency treatment; anaphylaxis is not a complication that occurs uniquely in the home infusion setting. Therefore, any registered nurse with hospital experience would be qualified to testify on the issue of the standard of care relevant to an anaphylactic patient. Anne Heuser was a registered nurse with 19 years of experience, who had worked in emergency rooms and trauma centers, including hospitals in the New York area. This adequately laid the foundation for her opinion, and her affidavit should not have been rejected as a matter of law. While the question of whether an expert witness is qualified generally rests in the sound discretion of the trial court (*Matter of Pringle v Pringle*, 296 AD2d 828, 829 [2002]), in the context of this motion, Nurse Heuser's affidavit was competent to establish that Nurse Russo's conduct comported with the applicable standard of care.

It is therefore necessary to turn to the issue of what issues of fact are presented as to Nurse Russo's liability so as to preclude summary judgment.

New York case law is not well developed in regard to the standard to which specialty nurses should be held. Furthermore, even assuming specialized nurses are held to a higher standard of care than ordinary nurses, it is not clear how that standard should be established, whether through the adoption of national

standards as proposed by plaintiffs' expert, Nurse Hadaway, or by local standards. No court in New York has addressed the standard of care to be applied to a nurse who specializes in a field for which New York does not issue advanced certification.

While Nurse Russo did not possess CRNI certification, at the time such certification was not a recognized accreditation by the American Board of Nursing Specialties. However, even in areas without professional certification, New York may hold specialized nurses to a heightened standard of care, just as physicians in this state are held to a standard under which they must employ any superior knowledge and skill they have, even if it exceeds that of the average doctor or specialist in the community where they practice (*Nestorowich v Ricotta*, 97 NY2d 393, 398 [2002]).

To the extent it is asserted that Nurse Russo did not properly handle her patient's anaphylactic reaction, such as in the manner and position in which she provided CPR to her patient, plaintiffs' claims create issues of fact which preclude summary judgment. The issue of whether proximate causation was established is also properly left to trial.

However, the portion of the ruling permitting liability to be based on Nurse Russo's failure to take steps to ensure that epinephrine was available in the event of an anaphylactic reaction should not stand. If, as plaintiffs' expert claims, anaphylaxis is a medically-recognized side effect of Solu-Medrol such that epinephrine should be "immediately available" when it is administered, it would have been the responsibility of the prescribing physician to provide the administering nurse with the necessary antidote along with the medication. Yet, plaintiffs do not claim that the *physician* who prescribed the course of treatment with Solu-Medrol committed malpractice by failing to make sure that epinephrine was available.[2] How can we allow plaintiffs to contend that the administering nurse's failure to independently take steps to arrange for the availability of a prescription medication constituted nursing malpractice, particularly where the prescribing physician is not even named as a defendant?

Notably, plaintiffs do not even claim that ensuring that epinephrine is available along with a prescription for Solu-Medrol is such a standard practice that its absence would be

---

2. Indeed, plaintiffs' appellate counsel affirmatively took the position that the physician committed no malpractice.

recognized as a clear impropriety by any competent nursing professional, which forecloses any reliance on the theory mentioned in *Toth v Community Hospital*—namely, that nurses may be liable for following a physician's orders when they are clearly contraindicated by normal practice (*see* 22 NY2d at 265 n 3). Additionally, although plaintiffs' experts assert that epinephrine should have been administered, neither of plaintiffs' experts testified that epinephrine was normally made available to nurses whenever home infusion therapy was performed. The monograph Hadaway cited, saying that epinephrine *should* always be available when Solu-Medrol is administered, does not establish that this recommendation has actually been followed in the general practice of home infusion therapy. Indeed, Nurse Russo pointed out that in the course of her entire career in home nursing care, no anaphylaxis kit had ever been dispensed to her along with medication to administer, although as admitted by Dr. Wajda, plaintiffs' expert witness, *any* medication at all may trigger anaphylaxis. There was no existing standard or duty in the law requiring epinephrine to be made available when performing home infusion therapy, and there is certainly no law in New York imposing a duty on the part of a nurse to obtain an anaphylaxis kit when administering home infusion therapy.

Finally, I observe that the use of home infusion therapy to administer powerful medications, rather than administering them in a hospital setting where crash carts and antidotes are at hand, certainly has many cost benefits and personal benefits to the patient. But, if plaintiffs are correct and such powerful medications are accompanied by a substantial possibility of a life-threatening adverse reaction, the medical profession and our society in general ought to reconsider the advisability of employing home infusion therapy without providing the medical provider administering the infusion with at least an epi-pen to combat such a reaction.

Based upon the showing made, disputed issues of fact as to whether Nurse Russo properly handled Tiffany's anaphylaxis, such as in performing CPR, justify denying her motion for summary judgment. However, the issues of fact remaining for trial should not include the possibility that liability be based on the failure to administer or procure epinephrine.

DEGRASSE and MANZANET-DANIELS, JJ., concur with MAZZARELLI, J.P.; SAXE and NARDELLI, JJ., concur in part and dissent in part in a separate opinion by SAXE, J.

Order, Supreme Court, Bronx County, entered on or about October 29, 2009, affirmed, without costs.